UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

RICHARD LEONARD COLE ,

                Plaintiff,

   v.

STEPHEN SINCLAIR et al. ,

                Defendant.

CASE NO. 3:21-cv-05089-RSM-BAT

**REPORT AND RECOMMENDATION**

Plaintiff Richard Leonard Cole, proceeding *pro se* and *in forma pauperis*, filed this civil rights action pursuant to 42 U.S.C. § 1983. Dkt. 4. Plaintiff is an inmate in the custody of the Washington State Department of Corrections (DOC); at the times relevant to this action, he was confined at the Washington Correction Center (WCC). Plaintiff's complaint names as defendants Stephen Sinclair, DOC secretary; Daniel Wright, WCC superintendent; Dean Mason, WCC associate superintendent; Michael Green, WCC incident commander; Norman Goodenough, WCC healthcare manager; and John/Jane Does, medical staff in charge of health needs at WCC. Plaintiff alleges that failure to provide him with appropriate medical care and accommodations for his medical conditions and failure to protect him from exposure to COVID-19 violated his rights under the Eighth and Fourteenth Amendments.

REPORT AND RECOMMENDATION - 1

Now before the Court is defendants' motion for summary judgment seeking dismissal of plaintiff's claims against them. Dkt. 26. For the reasons below, the Court recommends that defendants' motion for summary judgement be GRANTED and plaintiff's claims be DISMISSED with prejudice.

## FAILURE TO RESPOND

Defendants filed their motion for summary judgment (Dkt. 26) along with supporting declarations from Scott Russell (Dkt. 27), Shane Ririe (Dkt. 28), Norman Goodenough (Dkt. 29), Jolene Downs (Dkt. 30), and Sarah Brisbin (Dkt. 31). Defendants also filed a *Rand* notice warning plaintiff of the need to submit evidence in response to the motion. Dkt. 36.

Notwithstanding his receipt of the *Rand* notice warning of the need to submit evidence to support his claims, plaintiff has not filed a response to defendants' motion. Furthermore, plaintiff's complaint was not signed under penalty of perjury and therefore is not considered as evidence. *See Jones v. Blanas*, 393 F.3d 918, 923 (9th Cir. 2004) (in a *pro se* case, the court will consider a complaint signed under penalty of perjury as evidence to the extent it is based upon personal knowledge that would be admissible in evidence); *Schroeder v. McDonald*, 55 F.3d 454, 460 n.10 (9th Cir. 1995) (to be a "verified" complaint considered as evidence, the complaint must be signed under penalty of perjury in compliance with 28 U.S.C. § 1746). However, as discussed below, even if the allegations in plaintiff's complaint are considered, plaintiff has still failed to present sufficient evidence to support his claims.

## STATEMENT OF RELEVANT FACTS

A.   **DOC's COVID-19 response**

Beginning in February 2020, DOC implemented department-wide policies and procedures to address the risk of COVID-19 to inmates and staff. Dkt. 27, Declaration of Scott

REPORT AND RECOMMENDATION - 2

Russell (Russel Decl.) at 2. These measures included screening and testing of inmates and staff, isolation and quarantine of affected individuals, medical care for individuals who test positive for COVID-19, preventative measures for high-risk inmates housed in certain units, and use of personal protective equipment (PPE). *Id.* at 3.

To mitigate the risk of COVID-19 entering facilities, all incoming inmates undergo an initial quarantine at the WCC Reception Unit. Russel Decl. at 4. Incoming inmates are housed with their arrival cohort during the quarantine, during which time they are housed separately from the general population and should have no contact with other inmates or arrival cohorts. Dkt. 31, Declaration of Sarah Brisbin (Brisbin Decl.), ex.1 at 19. Following the quarantine period and negative COVID-19 test results, inmates are housed in the Reception Unit for 8 to 10 weeks while they are classified and then are assigned housing at WCC or sent to a different facility. Brisbin Decl., attach. K at 121.

The WCC Reception Unit, which includes six housing units, R1, R2, R3, R4, R5, and R6, was experiencing a significant COVID-19 outbreak from November 2020 through March 2021, with positive cases being found in multiple units. Dkt. 29, Declaration of Norman Goodenough (Goodenough Decl.) at 2. This resulted in quarantines, restricted movement orders, and limitations on gathering of inmates. *Id.* These restrictions impacted the available housing options for inmates, including limitations on housing in units designated for inmates with acute medical needs and those physically unable to use stairs. *Id.* At the time plaintiff arrived at WCC, positive COVID-19 tests in unit R3, where plaintiff was assigned, resulting in a cohort system and movement restrictions keeping each tier separate from the others. Goodenough Decl. at 2.

REPORT AND RECOMMENDATION - 3

**B.     Plaintiff's stay at WCC**

Plaintiff arrived at WCC on November 24, 2020. *Id.* at 3. Upon arrival, plaintiff underwent a medical intake screening, where he reported a history of seizures and dental concerns, and that his current medications were calcium carbonate (antacid) and levetiracetam (for seizures). *Id.* at 3; Brisbin Decl., Attach. B. He requested a bottom bunk, lower-tier assignment so he would not have to use the stairs. Dkt. 4 at 7. Nursing staff completed a temporary health status report (HSR) for a lower-tier, lower-bunk housing assignment. Goodenough Decl. at 3; Brisbin Decl., Attach. B. The temporary HSR was scheduled to expire on January 1, 2021, and was intended to bridge the gap between his arrival at WCC and his initial intake exam. Goodenough Decl. at 3; Brisbin Decl., Attach. B. Plaintiff was given a lower-tier, lower-bunk assignment for his initial quarantine. Goodenough Decl. Ex. 3.

Plaintiff's initial quarantine ended on December 7, 2020; at that time, he received a new HSR for a lower-bunk, but not a lower-tier, assignment. Brisbin Decl. Attach. C. He was reassigned to an upper-tier, lower-bunk assignment. Goodenough Decl. Ex. 3. In his complaint, plaintiff states that he protested the move and told prison officials that he should not be housed on an upper tier because he has a seizure disorder and should not use the stairs. Dkt. 4 at 8.

Plaintiff filed a grievance regarding his housing assignment. Brisbin Decl. Attach. F at 1. The response stated: "The initial HSR written by the intake nurse at your request was a bridge until you are seen by a Medical provider. Our HSR protocol is clear about a lower bunk HSR for a seizure disorder, but doesn't provide for lower tier, which is why the Medical provider did not write the follow up HSR that way." *Id.* at 2. Plaintiff appealed the decision and received a response reiterating that HSR protocols allow for a lower bunk but not a lower tier assignment for seizure disorder, and stating that it would not be possible to deviate from the HSR protocols

REPORT AND RECOMMENDATION - 4

1  because housing assignments were strictly regulated as part of the COVID-19 protection

2  measures. *Id.* at 3, 5.

3  Plaintiff filed a second grievance about his housing assignment and COVID-19 policies

4  at WCC. Brisbin Decl. Attach G. at 1. He argued that his chronic health issues place him at

5  higher risk of death from COVID-19, that there were no precautions in place to protect him, and

6  that he could not maintain social distance from his cell mates. *Id.* The response stated that living

7  quarters, including cells, are not "social areas" but are akin to living with roommates or family

8  members, and "social distancing does not apply to household environments." *Id.*

9  In the months following his arrival at WCC, plaintiff had numerous encounters with

10  health services, both through written kites and in-person visits, and was prescribed additional

11  medications including an albuterol inhaler for his COPR, cholesterol medication for his heart

12  disease, and medication for chronic pain. Dkt. 28, Declaration of Shane Ririe (Ririe Decl.) at 2-3;

13  Goodenough Decl. Attach D. Treatments for COPD and heart disease vary considerably, and

14  appropriate treatments for these conditions are determined based on a number of factors,

15  including the patient's medical history, other health issues, symptoms, and progression of the

16  disease. Ririe Decl. at 3. All medications and prescriptions are at the discretion of the clinician

17  based on their clinical assessment. Goodenough Decl. at 3. Plaintiff's requests for other

18  medications were denied because DOC did not have records of prescribing these medications for

19  him, but health services staff informed him that if an outside provider had prescribed these

20  medications, DOC could request the records. Goodenough Decl. Attach. D at 4.

21  Plaintiff states in his complaint that on January 13, 2021, he experienced a seizure while

22  asleep in his bed. Dkt. 4 at 14. He fell out of bed and woke up bleeding from his ear. *Id.* He

23  states that he was unable to report this incident to medical staff until the end of the day, at which

REPORT AND RECOMMENDATION - 5

time the nurse on duty informed him that too much time had passed since the incident and there was nothing to be done at that time. *Id.* There were no entries in plaintiff's medical records to indicate that he reported a seizure in January 2021 or in any subsequent medical appointments. Goodenough Decl. at 4.

In February 2021, plaintiff received his intake physical exam, which included lab work. Goodenough Decl. Attach D; Brisbin Decl. Attach H at 5-12. About ten days later, health services notified plaintiff that he had tested positive for Hepatitis C. Brisbin Decl. Attach H at 5-12. Heath services stated it would recheck his blood in six months and if he continued to have the virus in his blood at that time, he could discuss possible treatment with the infectious disease nurses. *Id.* Due to the length of time needed for Hepatitis C treatment, inmates usually receive this treatment at the parent facility, as they do not spend enough time at the Reception Unit to receive the work up and treatment for this condition. Goodenough Decl. at 3.

On March 18, 2021, plaintiff was transferred to Coyote Ridge Corrections Center. Goodenough Decl. Attach C. During his stay at WCC, he was seen in-person by medical staff 16 times, averaging out to more than once per week; he also sent three kites to health services and received a response to all three. *Id.* Attach D.

**PLAINTIFF'S CLAIMS**

Plaintiff asserts the following claims:

1. Prison officials violated his Eighth and Fourteenth Amendment rights by failing to protect his health and safety when they placed him in a unit with stairs and gave him a housing assignment on an upper tier despite knowing he had medical conditions that made climbing stairs a risk. Dkt. 4 at 6-10.

REPORT AND RECOMMENDATION - 6

  2.  Prison officials violated his Eighth and Fourteenth Amendment rights by placing him around inmates who have been affected by COVID-19 and who continue to test positive for COVID-19; by placing him in a cell with three other inmates where he could not practice social distancing; and by not taking precautions to protect him from COVID-19 and individuals who test positive for COVID-19, despite knowing that he is at high-risk of dying from COVID-19 due to his underlying medical conditions including chronic lung disease. Dkt. 4 at 11-13.

  3.  Prison official violated his Eighth and Fourteenth Amendment rights by failing to give him appropriate medications for his medical conditions and by failing to provide medical care when he had a seizure. Dkt. 4 at 13-15.

As relief, plaintiff requests immediate release and damages of up to $250,000. Dkt. 4 at 23-25.

## DISCUSSION

**A. Summary Judgment Standard**

Under Rule 56 of the Federal Rules of Civil Procedure, "the court shall grant summary judgment if the movant shows there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:

> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1). All facts and reasonable inferences drawn therefrom must be viewed in the light most favorable to the nonmoving party. *Furnace v. Sullivan*, 705 F.3d 1021, 1026 (9th

REPORT AND RECOMMENDATION - 7

Cir. 2013) (*citing Torres v. City of Madera*, 648 F.3d 1119, 1123 (9th Cir. 2011); *Tarin v. County of Los Angeles*, 123 F.3d 1259, 1263 (9th Cir. 1997).

The party moving for summary judgment has the initial burden to demonstrate no genuine issue of material fact remains in this case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986); *In re Oracle Corp. Securities Litigation*, 627 F.3d 376, 387 (9th Cir. 2010). The movant "always bears the initial responsibility of informing the district court of the basis for its motion," and identifying those portions of the record, including pleadings, discovery materials, and affidavits, "which it believes demonstrate the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323. Mere disagreement or the bald assertion stating a genuine issue of material fact exists does not preclude summary judgment. *California Architectural Building Products, Inc. v. Franciscan Ceramics, Inc.*, 818 F.2d 1466, 1468 (9th Cir. 1987). A "material" fact is one which is "relevant to an element of a claim or defense and whose existence might affect the outcome of the suit," and the materiality of which is "determined by the substantive law governing the claim." *T.W. Electrical Serv., Inc. v. Pacific Electrical Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

The moving party is "entitled to a judgment as a matter of law" [where] the nonmoving party has failed to make a sufficient showing on an essential element of [their] case with respect to which [they have] the burden of proof." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 2552, 91 L. Ed. 2d 265 (1986). "[T]he burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Id.*, at 325.

Mere "[d]isputes over irrelevant or unnecessary facts," therefore, "will not preclude a grant of summary judgment." *Id.* Rather, the nonmoving party "must produce at least some

REPORT AND RECOMMENDATION - 8

'significant probative evidence tending to support the complaint.'" *Id.* (*quoting Anderson*, 477 U.S. at 290); *see also California Architectural Building Products, Inc.*, 818 F.2d at 1468 ("No longer can it be argued that any disagreement about a material issue of fact precludes the use of summary judgment."). In other words, the purpose of summary judgment "is not to replace conclusory allegations of the complaint or answer with conclusory allegations of an affidavit." *Lujan v. National Wildlife Federation*, 497 U.S. 871, 888 (1990). "If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . grant summary judgment if the motion and supporting materials--including the facts considered undisputed--show that the movant is entitled to it[.]" Fed R. Civ. P. 56(e)(3).

### B. Personal Participation of Named Defendants

To state a claim for relief under 42 U.S.C. § 1983, a plaintiff must show that (1) he suffered a violation of rights protected by the Constitution or created by federal statute, and (2) the violation was proximately caused by a person acting under color of state law. *Leer v. Murphy*, 844 F.2d 628, 632 (9th Cir. 1988). To meet the second requirement, the plaintiff must allege facts that show how individually named defendants caused or personally participated in causing the alleged harm. *Id.* at 633.

To be liable for "causing" the deprivation of a constitutional right, the particular defendant must commit an affirmative act, or omit to perform an act, that he or she is legally required to do, and which causes the plaintiff's deprivation. *Johnson v. Duffy*, 588 F.2d 740, 743 (9th Cir. 1978). Defendants in a § 1983 action cannot be held liable based on a theory of respondeat superior or vicarious liability. *Polk City v. Dodson*, 454 U.S. 312, 325 (1981); *Monell v. New York City Dep't of Soc. Serv.*, 436 U.S. 658, 694 n.58 (1978). A supervisor is only liable

for constitutional violations of subordinates if the supervisor participated in or directed the violations, or knew of the violations and failed to act to present them. *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989). Vague and conclusory allegations of official participation in civil rights violations are not sufficient to state a claim of relief. *Pena v. Gardner*, 976 F.2d 469, 471 (9th Cir. 1992).

In his complaint, plaintiff did not explain how any named defendant personally participated in any of the acts or decisions regarding his medical care or housing assignments, or were even aware of these acts or decisions. Similarly, he did not explain how any named defendant personally participated in establishing or implementing COVID-19 protocols at WCC. Rather than naming individuals he alleges were involved in these acts, plaintiff repeatedly refers to "prison officials" and "medical staff," and occasionally uses titles such as "intake nurse" or "grievance coordinator." The only times he names individuals in his complaint is in the caption where he lists the defendants. Dkt. 4 at 1-2. In addition, all named defendants hold supervisory positions at DOC or WCC. Supervisory liability is insufficient to establish a violation of § 1983 and plaintiff has not explained how these individuals personally participated in the harm he alleges.

Plaintiff also includes in his list of defendants "All Medical Staff who are in control of medical needs and medication such as Doctors, Nurses, and Medical Staff in charge, or involved in this case and appointed by the Department of Correction." Dkt. 4 at 2. This generic description of a group of individuals is insufficient to establish personal participation in causing plaintiff the alleged harm.

Because plaintiff does not attribute any specific actions or inactions to any named defendant, instead describing actions of unnamed "prison officials" and "medical staff," plaintiff

REPORT AND RECOMMENDATION - 10

has not established personal participation by any defendant. The Court therefore recommends that defendants' motion be granted and that plaintiff's claims be dismissed with prejudice.

C. **Eighth Amendment claims**

Even though the Court recommends dismissal for failure to allege personal participation by any defendant, the Court also finds that plaintiff's allegations do not support his Eighth Amendment claims.

For an inmate to bring a valid § 1983 claim against a prison official for a violation of the Eighth Amendment's prohibition of cruel and unusual punishment, the inmate must allege (1) deprivation of something sufficiently serious and (2) that the deprivation occurred with deliberate indifference to the inmate's health or safety. *Lemire v. Cal. Dep't of Corr. & Rehab.*, 726 F.3d 1062, 1074 (9th Cir. 2013). In order to prevail on an Eighth Amendment claim for inadequate medical care, a plaintiff must show deliberate indifference to his serious medical needs. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). The deliberate indifference standard requires that the prison official knows of and disregards an excessive risk to inmate health or safety. *Farmer v. Brennan*, 511 U.S. 825, 837 (1994).

1. *Plaintiff's Housing Assignment*

Plaintiff alleges that medical staff and prison officials failed to protect his health and safety by assigning him to a housing unit with stairs and by assigning him to an upper-tier, lower-bunk cell within that unit. Dkt. 4 at 6-10. He alleges that he was at risk of serious injury or death if he had had a seizure while on the stairs. *Id.* He asserts that WCC policy is to assign inmates who cannot use the stairs to units R4, R5, or R6. *Id.* at 9. However, other than his own allegations, plaintiff has submitted nothing to establish that he was unable to use stairs or that being required to use stairs placed him at an excessive risk to his health or safety.

Defendants have established that prison staff followed DOC protocols for inmates with seizure disorder by assigning plaintiff to a lower bunk. *See* Brisbin Decl. Attach. F. In so doing, prison staff protected plaintiff from the serious risk of falling from an upper bunk during a seizure while asleep in bed. In addition, defendants have established that because of the need to quarantine new arrivals and protect inmates from the ongoing COVID-19 outbreak at WCC, housing options were limited, with strict limitations on which units were available for new arrivals and on transferring inmates between units, including limitations on housing in units without stairs. Goodenough Decl. at 2. Prison staff made plaintiff's housing assignments based on the need to protect him from established risks of seizure disorder and the need to protect plaintiff and all other inmates from the risks of COVID-19. Plaintiff may have preferred to not use stairs, but he has not established that his assignment in a unit with stairs or in an upper-tier housing assignment was deliberate indifference to his serious medical needs.

  2.  COVID-19

Plaintiff alleges that that prison officials and medical staff placed him around inmates who had been affected by COVID-19 and who continued to test positive for COVID-19, and that they prevented him from maintaining social distance by housing him in a cell with three other inmates, despite knowing that he was at high risk of death from COVID-19 because of his underlying medical conditions including chronic lung disease Dkt. 4 at 11-12. He alleges this was a total disregard for his life, health, and safety, and constituted gross negligence, reckless endangerment, and deliberate indifference to his serious medical needs. Dkt. 4 at 11-12.

Defendants acknowledge that contracting COVID-19 is a serious risk to the health of any individual. Dkt. 26 at 14. However, they have also established that DOC undertook a comprehensive approach to address the risks of COVID-19 within the prison setting, including

REPORT AND RECOMMENDATION - 12

testing, quarantines, restricted movement orders, and limitations on gathering of inmates. Russell Decl. at 2-4. Far from being indifferent to the risks of COVID-19, defendants have shown that DOC addressed these risks and attempted to mitigate them within the confines of the prison setting. Even if these measures did not eliminate all risk of contracting COVID-19, this does not establish that defendants were deliberately indifferent to inmates' serious medical needs. *Hope v. Warden York Cty. Prison*, 972 F.3d 310, 330 (3rd Cir. 2020). Prison officials acted reasonably in developing and implementing a plan to mitigate the spread of COVID-19 in the prison setting. Plaintiff has not established that defendants were deliberately indifferent to the serious risks of contracting COVID-19 for plaintiff or any other inmate.

       3.     *Plaintiff's Medical Care*

Plaintiff alleges that prison staff ignored his medical conditions and failed to prescribe him the proper medications. Dkt. 4 at 13-15. With respect to medications, plaintiff alleges that although he is prescribed medication for high cholesterol, he does not receive medication to treat his underlying heart disease or to prevent heart attacks; although he received an abluterol inhaler for his lung disease he was not prescribed medication to treat his COPD; and he received no treatment for his hepatitis C. Dkt. 4 at 14. He also alleges that when he suffered a seizure and fell out of his bed, suffering an injury that left him bleeding from his ear, he received no medical treatment at all. Dkt. 4 at 14-15.

Defendants have established that plaintiff received extensive medical care during his stay at WCC. He was seen in-person for medical care 16 times, or more than once per week on average, and he received responses to the four kites he sent regarding medical care. Goodenough Decl. Attach. D. He was prescribed medication as medical providers deemed appropriate for his medical conditions based on clinical assessments. Ririe Decl. at 2. When he tested positive for

REPORT AND RECOMMENDATION - 13

Hepatitis C, a treatment plan was developed to evaluate future treatment for this condition. Brisbin Decl. Attach H at 5-12. The evidence establishes that WCC staff did not ignore plaintiff's medical conditions or fail to prescribe appropriate medications.

Although plaintiff believes he should have received other medications or treatment in addition to what he received at WCC, this belief is insufficient to establish an Eighth Amendment violation. Deliberate indifference to a serious medical need requires more than a difference of opinion between the prisoner-patient and prison medical authorities regarding treatment. *Franklin v. State of Oregon, State Welfare Div.*, 662 F.2d 1337, 1344 (9th Cir. 1981) (citing *Mayfield v. Craven*, 433 F.2d 873, 874 (9th Cir. 1970)). Plaintiff has not submitted any evidence to support his claim that he should have received different or additional medications or treatment, or that the failure to provide such medications or treatment placed him at serious risk.

With respect to the seizure incident, defendants have submitted that there is no record of plaintiff reporting a seizure to any DOC staff, including at six in-person medical visits plaintiff had after the date he states he had the seizure. Goodenough Decl. at 4. Without establishing that DOC staff knew plaintiff had a seizure and took no action, plaintiff has not established deliberate indifference to his need for post-seizure treatment.

Plaintiff has not established that defendants were deliberately indifferent to a serious risk to his health and safety. Accordingly, the Court recommends that defendants' motion for summary judgment be granted as to plaintiff's Eighth Amendment claims.

**D.    Fourteenth Amendment Claims**

Plaintiff presents his claims as arising under both the Eights and Fourteenth Amendments. The Fourteenth Amendment's due process clause applies to persons in custody prior to conviction. *Castro v. County of Los Angeles*, 833 F.3d 1060, 1067-68 (9th Cir. 2016)

(citing *Bell v. Wolfish*, 441 U.S. 520, 535 (1979)). As plaintiff has not shown that he was in DOC custody prior to conviction, he has not established that the Fourteenth Amendment protections apply to his claims. Accordingly, the Court recommends that defendants' motion for summary judgment be granted as to plaintiff's Fourteenth Amendment claims.

## CONCLUSION

For the foregoing reasons, the undersigned recommends that defendants' motion for summary judgment (Dkt. 26) be **GRANTED** and plaintiff's claims be **DISMISSED** with prejudice.

## OBJECTIONS AND APPEAL

This Report and Recommendation is not an appealable order. Therefore a notice of appeal seeking review in the Court of Appeals for the Ninth Circuit should not be filed until the assigned District Judge enters a judgment in the case.

Objections, however, may be filed and served upon all parties no later than **November 29, 2021.** The Clerk should note the matter as ready for the District Judge's consideration on that date if no objection is filed. If objections are filed, any response is due within 14 days after being served with the objections. A party filing an objection must note the matter for the Court's consideration 14 days from the date the objection is filed and served. The matter will then be ready for the Court's consideration on the date the response is due. Objections and responses shall not exceed **10 pages**. The failure to timely object may affect the right to appeal.

DATED this 8th day of November, 2021.

BRIAN A. TSUCHIDA
United States Magistrate Judge